IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JUANITA M. PRADO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 942 |
| | ) | |
| v. | ) | |
| | ) | Hon. Michael T. Mason |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Juanita M. Prado ("Prado" or "claimant"), has brought a motion for summary judgment [18] seeking to reverse the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Prado's claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). In response to Prado's motion, the Commissioner filed a cross-motion for summary judgment [24] asking this Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Prado's motion for summary judgment is denied, and the Commissioner's cross-motion for summary judgment is granted.

**I.    BACKGROUND**

    **A.    Procedural History**

On January 16, 2004, claimant filed an application for disability insurance

1

benefits, alleging a disabling condition stemming from a mastectomy of her right breast. (R. 54-56). Her alleged onset date was December 11, 2003. (*Id.*). Claimant's date last insured was December 31, 2009. (R. 14). The Social Security Administration initially denied her claim on March 10, 2004, and again upon reconsideration on September 30, 2004. (R. 30-36, R. 40-43). Claimant filed a timely request for a hearing. (R. 44). ALJ John K. Kraybill ("ALJ Kraybill") presided over the hearing on April 4, 2006. (R. 14-18). Claimant testified with the assistance of a Spanish interpreter at the hearing. (R. 221-31).

Prado was born on September 29, 1947. (R. 87). She was fifty-eight years old on the date of the April 4, 2006 hearing. (*Id.*) She had two years of education in Mexico and does not speak, read, or write English. (R. 64). In 2004, she stood 5'3" and weighed 220 pounds. (*Id.*)

On June 22, 2006, ALJ Kraybill issued a written decision denying claimant's request for benefits. (R. 14-18). The Appeals Council denied claimant's request for review on December 15, 2006, making the ALJ's decision the final decision of the Commissioner. (R. 5); 20 C.F.R. § 404.981. Claimant subsequently filed this action.

    **B.    Medical Evidence**

        **1.    Cancer Treatment**

On August 28, 2003, Dr. Mohammed E. Souman ("Dr. Souman") of the MacNeal Cancer Center examined claimant. (R. 121, R. 129). On that date, Dr. Souman reviewed claimant's abnormal mamography revealing "multiple microcalfications" in her right breast. (*Id.*). Dr. Souman recommended a biopsy, which revealed "Infiltrating Ductal Carcinoma, Grade II out of III" in claimant's right breast. (R. 126-27). Claimant

underwent a total mastectomy of her right breast and node dissection on December 12, 2003 in a surgery performed by Dr. Souman. (R. 126-27, R. 122).

On December 16, 2003, Dr. Souman noted that claimant's "wound is healing well" and that there is a "[m]oderate amount of drainage." (R. 115). On December 22, 2003, claimant sought treatment from Dr. Mary Beth Leonard ("Dr. Leonard"), due to concerns about fluid collection underlying her mastectomy skin flaps. (R. 113). Dr. Leonard aspirated 400 mL of seroma from claimant's wound that day. (*Id.*). Four days later, Dr. Jeffrey Zawacki ("Dr. Zawacki") noted that claimant's "wound is clean and healing well," and "there is no evidence for infection, though clearly more seroma fluid has accumulated underneath the flaps." (R. 112). Dr. Zawacki aspirated 380 cc of fluid from Prado's wound. (*Id.*). Drs. Souman and Zawacki aspirated additional fluid on December 30, 2003 and January 9, 2004 from claimant's wound. (R. 110-11).

On January 6, 2004, Dr. John Berry ("Dr. Berry"), Prado's treating physician and oncologist at the MacNeal Cancer Center, noted that her pathology revealed positive lymph nodes and Stage III cancer. (R. 134). Prado began chemotherapy in January 2004, with a second cycle commencing in April 2004. (R. 134, R. 139). At a "reevaluation" visit with Dr. James J. Greenberg ("Dr. Greenberg") on January 21, 2004, claimant denied any pain and stated that her lump had decreased in size and that "it is getting better." (R. 108). Dr. Greenberg noted "recurrent seroma." (*Id.*). On February 10, 2004, Dr. Souman determined that claimant had a "well-healed" wound with "no evidence of local recurrence or adenopathy" other than "some mild edema." (R. 107). He prepared a note stating that claimant was "unable to work because she is following up after surgery in my office and also having chemotherapy in Dr. [John]

3

Berry's office." (R. 118).

Dr. Berry indicated on March 5, 2004 that Prado was "tolerating the chemotherapy aside from some nausea that prevents her from eating much for about four days after the treatment." (R. 135). Dr. Berry noted that Prado was "in no apparent distress," her pulse was regular, and she had no lymphadenopathy. (*Id.*). He opined that claimant had alopecia, her right mastectomy scar had lymphedema, and she was "currently doing relatively well." (*Id.*).

On April 1, 2004, Dr. Berry reported that Prado had "tolerated her chemotherapy remarkably well to date with no untoward side effects." (R. 137). Dr. Berry found her "appear[ing] well" with no adenopathy, a clear chest, normal heart sounds, and "no organomegaly or abnormal masses." (*Id.*). Dr. Berry also noted that:

> Unfortunately, this patient works on an assembly line and she is having some issues about her ability to continue working and at this point in time has been declined for social security. She is receiving rather intense therapy. All I can possibly do is if she wishes to continue to work is maybe modify her therapy so as to inconvenience her less and allow her to keep her potential position at this time.

(R. 137-38). Claimant returned to Dr. Souman on April 6, 2004. (R. 106). He indicated that claimant had "[n]o specific complaints." (*Id.*). His physical examination resulted in "[n]ormal findings." (*Id.*).

On April 30, 2004, Dr. Berry opined that Prado was "tolerating her regimen generally well." (R. 139). The doctor noted Prado's complaints of some "musculoskeletal discomfort in relation to the right axilla," and observed "reduced strength" in her right arm. (*Id.*). Dr. Berry noted no adenopathy, a "somewhat puckered" mastectomy scar, a clear chest, and normal heart sounds. (*Id.*). Dr. Berry

4

opined that although "[s]he has some intermittent tiredness and lethargy," claimant is otherwise "coping well." (*Id.*).

On June 14, 2004, Prado informed Dr. Berry that she had "some mild tiredness and lethargy which lasts for a day or so after chemotherapy but otherwise has no symptoms." (R. 140). He observed that Prado "looks well," that she had "no peripheral lymphadenopathy," and that the "mastectomy scar is free of local regional recurrence." (*Id.*). Dr. Berry concluded that claimant was "tolerating this regime surprisingly well." (*Id.*). On July 12, 2004, Dr. Berry noted that Prado had "tolerated the chemotherapy very well to date with no problems." (R. 141).

On July 27, 2004, Dr. Alexander K. Phillips ("Dr. Phillips") conducted a physical exam of claimant and recommended to Dr. Souman that Prado "receive post-operative external beam radiation therapy to her right chest wall, axilla, and supraclavicular fossa" over the course of five and a half weeks. (R. 130-31). Dr. Phillips noted that he observed no "palpable nodules" or "right upper extremity edema" upon examination of claimant's right chest wall. (*Id.*).

Prado began the first of twenty-eight radiation therapy sessions on August 2, 2004. (R. 132). On August 11, 2004, Dr. Berry indicated that Prado suffered an episode of shingles extending down the back of her left leg. (R. 142). Her primary care physician treated her with Valtrex. (*Id.*). Dr. Berry examined Prado and found that she "looks well," that she has no adenopathy, and her right mastectomy scar is free of local regional recurrence." (*Id.*).

Claimant returned to Dr. Phillips after completing radiation therapy on September 9, 2004. (R. 132). Dr. Phillips noted that claimant had experienced the "anticipated

5

cutaneous inflammatory reaction." (*Id.*). Upon examination, the doctor found "no evidence of moist desquamation" [shedding of outer layers of skin] and "no masses palpable on her right chest wall." (*Id.*). He also noted that she had "tolerated her external beam radiation therapy quite well." (*Id.*). On September 23, 2004, Dr. Phillips noted that Prado's skin had "healed very nicely." (R. 133). He observed "no palpable, cervical, supraclavicular, or axillary lymphadenopathy" and "no right upper extremity edema." (*Id.*).

On December 1, 2004, Prado informed Dr. Berry that she was "feeling generally well." (R. 144). Claimant also reported a "sense of hornification over the scalp." (*Id.*). He observed that Prado had a slightly elevated blood pressure and "some peau d'orange and induration from her radiation." (*Id.*). Dr. Berry continued claimant's prescriptions for Herceptin [a cancer controlling drug] and anastrozole [a medication used to regulate estrogen production]. (*Id.*). On March 4, 2005, Dr. Berry observed that Prado had gained weight. (R. 145). He noted claimant's report that she "feels generally well," and had no complaints regarding her cardiovascular, respiratory, skin or endocrine systems. (*Id.*). Prado returned for treatment on June 6, 2005, and stated that she has "been well." (R. 146). Dr. Berry observed that claimant's blood tests "all appeared to be within normal limits." (*Id.*). Prado's daughter reported to Dr. Berry that Prado was "functioning well," while Prado indicated she "does notice some minor swelling in the right arm if she overextends herself." (*Id.*).

On November 8, 2005, Prado had a diagnostic mammogram of her left breast at the MacNeal Cancer Center. (R. 147). A radiologist compared that exam to claimant's earlier mammograms from 2003 and 2004. (*Id.*). Prado's 2005 mammogram revealed

6

"no discrete masses, malignant calcifications, skin thickening or nipple retraction," nor did it reveal any "direct or indirect evidence of malignancy in the left breast." (*Id.*).

### 2. Primary Care Physician

During her cancer treatments, Prado saw her primary care physician, Dr. Ricardo Arze ("Dr. Arze"), several times. (R. 153-68, R. 89). On December 18, 2003, claimant stated that she "felt well physically," but was experiencing slight throbbing and discomfort in her right breast. (R. 156). During a February 14, 2004 visit with Dr. Arze, claimant reported that she felt "dizzy" and "down" and experienced nausea after chemotherapy. (R. 157). Dr. Arze noted that claimant "needs some form from work filled out" and "cannot do any physical effort otherwise she would [lose] 25% of her strength in her arm." (R. 158). On March 16, 2004, claimant reported to Dr. Arze that she felt weak after chemotherapy and still experienced dizziness and nausea. (*Id.*). On April 16, 2004, Prado complained of depression, dyspnea, fatigue, and a cough. (R. 159).

On June 6, 2004, Dr. Arze noted that claimant reported she "is feeling well" and that her symptoms of fatigue, dizziness, and nausea "have improved." (R. 160). On August 6, 2004, claimant sought treatment for a painful rash on her left leg and upper thigh.[1] (R. 161). Dr. Arze prescribed Valtrex. (*Id.*). On August 10, 2004, claimant informed Dr. Arze that she had noticed great improvement in the rash, but continued to experience itchiness on her left side. (R. 162). She also reported "some burning sensations, though very light," increased energy, and a decrease in dizziness from the

---

[1] Dr. Berry later noted this rash to be shingles. (R. 142).

radiation therapy.  (*Id.*).

During an October 16, 2004 visit with Dr. Arze, Prado complained of an increase in earaches, nasal pain, a fever, and "involuntary body movements" at night.  (R. 163).  She reported an increase in itchiness and a burning sensation.  (*Id.*).  Claimant also reported a tingling sensation on the left side of her body and face, and "some difficulty moving her right arm backwards."  (*Id.*).  On December 7, 2004, Dr. Arze noted that claimant "feels better."  (R. 164).

During a March 12, 2005 visit, claimant reported that she was recovering from a cold, and complained of earaches, eye problems, chills, fever, and some dizziness.  (R. 165).  She asked Dr. Arze if some of her medications could be responsible for causing "vaginal itchiness" and "dryness" as well as "hot flashes."  (*Id.*).  Dr. Arze made a note of "anemia."  (*Id.*).  On May 16, 2005, Dr. Arze diagnosed claimant with "lymphedema."  (*Id.*).  On December 16, 2005 and January 16, 2006, Prado complained of abdominal pain.  (R. 167).  On January 31, 2006, claimant reported a sore throat, throbbing ear pain, and a slight fever.  (*Id.*).  Dr. Arze diagnosed claimant with gallstones on March 11, 2006.  (R. 168; *see also* R. 89)

### C. The RFC Determination

On February 26, 2004, shortly after Prado applied for benefits, a state agency medical consultant reviewed her medical records and completed a physical residual functional capacity assessment ("RFC").  (R. 96-103).  That consultant opined that claimant was capable of lifting or carrying 50 pounds occasionally and 25 pounds frequently, standing or walking with normal breaks for a total of about six hours in an eight-hour workday, and sitting with normal breaks for a total of about six hours in an

eight-hour workday. (R. 97). On the last page of the report, the consultant wrote "capable of [illegible] work by 12/04." (R. 103).[2] A second state agency consultant appears to have concurred with that RFC on September 13, 2004. (R. 96).

On April 4, 2006, after the hearing, ALJ Kraybill requested that Dr. Berry complete a physical RFC assessment. (R. 169). In that RFC assessment, dated April 10, 2006, Dr. Berry concluded that Prado was capable of lifting or carrying 20 pounds occasionally and 10 pounds frequently. (R. 170-173). Dr. Berry opined that claimant's standing, walking, and sitting were not affected by her impairment, and that pushing and pulling in her upper extremities was limited. (*Id.*). He determined that she could "occasionally," *i.e.*, "from very little up to one-third of an eight-hour workday cumulatively", perform the postural activities of climbing, balancing, kneeling, crouching, crawling, and stooping. (R. 171.). Dr. Berry found that Prado's manipulative functions of reaching in all directions, handling, fingering, and feeling were unlimited, and that she had limited abilities to tolerate workplace temperature extremes and hazards such as machinery and heights. (R. 170-73). Dr. Berry opined that claimant's "R[ight] total mastectomy = 20% [less] strength in R[ight] arm." (R. 171). He also found that claimant "had extended field limitation which puts her at increased risk of swelling of the R[ight] arm if too much lifting/pushing or pulling." (*Id.*). ALJ Kraybill entered Dr. Berry's RFC assessment into the record and "relied upon, and g[ave] very substantial weight to" that assessment in his June 22, 2006 decision. (R. 91-92, R. 17).

---

[2] In his brief, the Commissioner interpreted this consultant's report as "opin[ing] that Plaintiff was capable of a full range of medium work, despite her impairments." Commissioner's Cross Motion, p. 3 (*citing* R. 97). Claimant states that the consultant opined that she was "capable of medium work by Dec. 2004." Claimant's Motion, p. 4.

### D. Claimant's Testimony

Prado testified that she worked for Bretford Manufacturing for thirty-five years, from November 1967 until December 11, 2003. (R. 222, 225). She stated that Bretford "let her go" because she "had only one year within which [she] could return to work, and [she] was not able to because the treatment had not ended yet." (R. 222). She applied for, but was denied, unemployment benefits. (R. 223). Prado testified that she is right-handed, and worked for Bretford assembling movie screens. (R. 223, 226). She stated that she would stand for the entirety of an eight-hour work day, reaching to staple the screens, transferring them to another table, and then rolling them with aluminum. (R. 226-27). Once the screens were rolled in aluminum, an air gun was used to drive screws into the rolls. (*Id.*). When asked how much the rolls weighed, claimant replied, "the first set that would weigh ten pounds, but then according to each next step and process, then it would weigh more according to more material we would put to the plastic rolls we also had to hammer." (R. 227). When completed, some of the rolls would weigh forty pounds. (*Id.*). In an eight-hour work day, Prado testified that "we would make 500 per day," and her work included lifting the completed rolls. (*Id.*).

Prado testified that she has had to use support bandages when her right arm "becomes swollen with the pain." (R. 223). She stated that her right arm "is always swollen," and that she is "not even able to lie down on the right side." (R. 224). When asked whether the swelling was worse on some days than on others, Prado responded "Well, yes. It depends on if I'm lying on it for too long, and then I turn over to the other side, it is very painful and even more swollen. So sometimes I have to lie on the other side or facing up." (*Id.*). She also stated that she has problems lifting her arm above

10

her shoulder level. (*Id.*).

Prado stated that she cannot lift "anything" heavy with her right arm. (R. 228). She was unable to hold her youngest grandchild after he was born because of her then-recent mastectomy. (*Id.*). She further stated, "now I can lift a gallon of milk. But if it hurts, then I have to lean on with this other hand." (*Id.*). In addition to the pain in her right arm, Prado "become[s] tired if I walk," and "sleep[s] during the day." (*Id.*). She stated that she can walk "maybe one block and then I have to sit down for awhile. Because I have a lot of pain in my bones due to that medication, the doctor said I would have a lot of pain that has to do with the bones." (*Id.*). She testified that she has not stopped taking medication since the chemotherapy. (R. 229). According to claimant, the side effects from her medication include fatigue and dizziness, and "ever since the operation" she has "had strong problems from the medication." (*Id.*).

When asked if her doctors placed any limitations on her ability to "do things," Prado responded that Dr. Berry "said that there was a certain percentage of the work that I would not be able to do because it causes pressure and swelling in the arm. And even taking the blood pressure, they are not able to do in this arm because that causes swelling. And since the job has to do with an air gun, it causes swelling." (R. 230).

### E. Vocational Expert's Testimony

Vocational Expert James Breen ("the VE" or "VE Breen") testified at the April 4, 2006 hearing. (R. 231-33). When asked by the ALJ to describe claimant's past work based on his review of the file, VE Breen testified that Prado "did production line assembly, unskilled, SVP2." (R. 232). He opined that as performed by claimant, her past work was in the medium work group category. (*Id.*). However, he further opined

11

that her past relevant work as described by the Dictionary of Occupational Titles ("DOT"), is "in the light work group category." (*Id.*). When asked by the ALJ for the "approximate number of jobs that would fit the DOT description in the light category," Breen responded that there are "about 37,000" such jobs, and that those jobs would require the use of both arms. (R. 232-33). Neither the ALJ nor claimant's counsel asked any other questions of the VE. (*Id.*).

## II.     ANALYSIS

### A.     Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This Court must consider the entire administrative record, but will not re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (*quoting Steele,* 290 F.3d at 940).

Additionally, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the

evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

To qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, ALJ Kraybill employed the five-step analysis. (R. 15-18). At step one, the ALJ found that claimant "has not engaged in substantial gainful activity at any time relevant to this decision." (R. 16). Next, at step two, ALJ Kraybill determined that

13

"claimant has the severe impairments of a history of breast cancer with surgery and post operative chemotherapy and radiation." (*Id.*). At step three, the ALJ found that claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ noted that he "scrutinized section 13.09 of the Listing of Impairments, which refers to breast cancer." (*Id.*). He concluded that because "claimant's carcinoma was successfully removed," "had not metastasized, nor has it recurred, it does not satisfy the severity criteria of this listing." (*Id.*).

The ALJ then assessed claimant's RFC in order to determine whether she could perform her past relevant work. (R. 16-17). The ALJ found that claimant has the RFC "to perform a restricted range of light work." (*Id.*). The ALJ determined that, based on the medical evidence, "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (R. 17). At step four, the ALJ found that claimant could perform her past relevant work as an assembler because she was capable of performing "the job of assembler as it is generally performed in the national economy." (R. 16-18). Since the ALJ found that claimant is able to perform her past relevant work, his sequential evaluation of Prado's claim ended with step four. Based on his analysis, the ALJ found "the claimant has not been under a 'disability,' as defined in the Social Security Act, from December 11, 2003 though the date of this decision." (R. 18).

Claimant argues that ALJ Kraybill erred in finding that she is capable of performing her past relevant work as an assembler. Claimant contends that the ALJ's

determination is inconsistent in that he found both: (1) that the claimant is limited to "light" work by adopting Dr. Berry's RFC, and (2) that she can perform her past relevant work, which VE Breen classified as "medium." Claimant further argues that reversal is warranted because the ALJ did not ask VE Breen whether claimant's limitations, as adopted from Dr. Berry's RFC, preclude her from performing the specific requirements of her past work as Dr. Berry's RFC was solicited the day of the hearing and submitted after the hearing. Finally, claimant contends that "at 58 years of age, limited to a range of light work," she is precluded from her past relevant medium work and is disabled under Vocation Rule 202.01. Claimant's Motion, p. 9.

### C. The ALJ Did Not Error in the Step Four Analysis

Claimant challenges the ALJ's determination that she was capable of performing her past relevant work. Claimant argues that the ALJ erred in finding that she can perform her past relevant work because he adopted both Dr. Berry's post-hearing RFC, which found that claimant was restricted to light work, and VE Breen's classification of claimant's former work as medium. Claimant does not dispute that she can perform light work as described by Dr. Berry. However, she contends that this case should be remanded because she cannot perform her specific job as a line worker assembling movie screens at Bretford Manufacturing. In response, the Commissioner argues that the ALJ properly found that claimant can perform her past relevant work as it is generally performed in the national economy. Claimant did not file a reply brief.

At step four, the ALJ must determine whether the claimant is capable of performing her past relevant work. This consideration may be based on a single job as performed by the claimant or as the job is generally performed in the national economy.

15

*Anderson v. Bowen*, 868 F.2d 921, 925 n.11 (7th Cir. 1989); *see also* 20 C.F.R. § 404.1520(f) (if claimant can still do the "kind of work" she has done in the past, she is not disabled); Social Security Ruling 82-61 (1982)(providing that a claimant is not disabled if she can perform the actual functional demands of a particular past job, or the functional demands of the occupation as generally required by employers in the national economy).

In this case, ALJ Kraybill found that claimant could perform the duties of an assembler as performed in the national economy. Based on Dr. Berry's RFC, the ALJ first determined "that the claimant has the residual functional capacity to perform a restricted range of light work." (R. 16). The ALJ specifically adopted the following portions of Dr. Berry's RFC: "she can lift 10 pounds frequently and 20 pounds occasionally. She has no sitting, standing, and/or walking limitations. She can only occasionally push and/or pull with her right upper extremity. She can only occasionally climb ladders, ropes, and scaffolds, ramps, stairs, balance, stoop, kneel, crouch and crawl. She can only occasionally work in temperature extremes, high humidity and wetness." (R. 17). Next, the ALJ found that the claimant "is capable of performing her past relevant work as an assembler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." (R. 18).

The ALJ recognized that the demands of claimant's actual past relevant work "was medium in physical demand as she performed it." (R. 18). However, the ALJ explained that he adopted the VE's characterization of claimant's past relevant as "exertionally light and unskilled..." under the DOT. (*Id.*). The guidelines require that, to

properly determine whether a claimant is physically capable of returning to her former work, the ALJ ascertain the demands of that work in relation to the claimant's present physical capacities. 20 C.F.R. § 404.1520(e). ALJ Kraybill complied with that requirement in finding that claimant was restricted to light, unskilled work, which includes the job of an assembler as that job is performed in the national economy. (R. 16-18). "Under sections 404.1520(e) and 416.920(e) of the regulations, a claimant will be found to be 'not disabled' when it is determined that he or she retains the RFC to perform: (1) The actual functional demands and job duties of a particular past relevant job; or (2) The functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Orlando v. Heckler*, 776 F.2d 209, 215 (7th Cir. 1985)(finding that the ALJ "was allowed to base his comparison on the functional demands and job duties of the occupation as generally required by employees throughout the national economy" in evaluating step four.); *see also* 20 C.F.R. § 1560 (b)(2). The DOT is a recognized source of vocational evidence. 20 C.F.R §§ 404.1566(d)(1), 416.966(d)(1). Therefore, we do not credit claimant's contention that the ALJ was required to compare her RFC to the actual functional demands and job duties of her particular past relevant job. Prado's claim that the ALJ errored in his step four analysis by finding that claimant could perform past relevant work is without merit.

    **D.    The ALJ Did Not Error in His Questioning of the VE.**

Claimant also argues that this case should be remanded because the ALJ did not ask VE Breen whether claimant's limitation of light work, as adopted from Dr. Berry's RFC, preclude her from performing the specific requirements of her past job. As

explained above, in order to determine if claimant was capable of performing her past relevant work, the ALJ can consider the actual functional demands of claimant's specific past job or the functional demands and job duties of the occupation as generally required by employers throughout the national economy.  In this case, the VE opined as to claimant's work group category for her job at Bretford Manufacturing and further opined as to her past relevant work as described by the DOT.  (R. 232).  The ALJ incorporated both these opinions into his ruling.  (R. 16-18).  Moreover, the ALJ's ultimate conclusion is consistent with Dr. Berry's RFC.  Therefore, the fact that VE Breen did not specifically consider Dr. Berry's RFC is not in error.  Even without the VE's testimony on this point, substantial evidence supports the ALJ's findings that claimant was limited to light work and that the job as an assembler is light work as defined in the national economy.  *See Steele*, 290 F.3d at 940 (finding that this Court must affirm the ALJ's decision if it is supported by substantial evidence).  Therefore, the ALJ did not error in neglecting to question the VE regarding Dr. Berry's RFC.

### E. Claimant Does Not Support Her Position that Vocation Rule 202.01 Applies in this Case.

Finally, claimant asks for a finding of disability pursuant to Vocational Rule 202.01.  That rule is found in Appendix 2 to Subpart P of Part 404 of the Medical-Vocational Guidelines.  The Medical-Vocational Guidelines include various combinations of exertional capabilities, age, education and work experience (also known as "Grids").  The Grids provide an overall structure for evaluation of those cases where the factors do not coincide with those of any specific rule.  In particular,

Vocational Rule 202.02 calls for a finding of disability for applicants of advanced age that have limited education and a history of unskilled work experience. Claimant contends, without explanation, that "at 58 years of age, limited to a range of light work, precluding her past relevant medium work [she] is disabled under Vocation Rule 202.01." Claimant's Motion, p. 9. Claimant does not cite any authority in support of this argument, nor does she cite to any related or supporting facts in the record.

Claimant has not shown that this issue is properly before this Court. Claimant has not provided any information that this argument was raised with the Social Security Administration. An issue must be developed, rather than merely mentioned, to be preserved in a court proceeding. *Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999). Here, claimant offers no development or evidence supporting her reliance on Grid Rule 202.01. Moreover, there is no information before us evidencing an error by the ALJ. Because Prado has not shown that this Rule applies to her claim or that this issue is properly before this Court, we do not reach this issue.

## III. CONCLUSION

For the reasons set forth above, Prado's motion for summary judgment [18] is denied and the Commissioner's motion for summary judgment [24] is granted. It is so ordered.

ENTERED:

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: April 21, 2010**